UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA, EASTERN DIVISION

| | | |
|---|---|---|
| M. C. *ex rel.* S. Harris, his mother, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | No. _____ |
| James Bennett, individually, the City | ) | |
| of Bettendorf, Bettendorf Community | ) | |
| School District, | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT**

M. C. *ex rel.* S. Harris makes the following complaint against James Bennett, the City of

Bettendorf, and the Bettendorf Community School District.

**Jurisdiction**

1.      This action arises under the United States Constitution and its Amendments and

42 U.S.C. § 1983, 42 U.S.C. § 1988, and the Constitution, laws, and legal rules of

procedure of the State of Iowa. Count I arises under 42 U.S.C. § 1983. The Court has

jurisdiction under 28 U.S.C. § 1331.

2.      This case arises from violating plaintiff's civil rights by unlawfully seizing

plaintiff's person and unlawfully assaulting plaintiff's person, and violating plaintiff's

right to due process of law as guaranteed by the Fourth Fifth, Fourteenth Amendments

to the United States Constitution. Jurisdiction is based upon 28 U.S.C. § 1331.

**The Parties**

3.      M.C. is a minor. S. Harris is his mother. At all times relevant to this complaint, they lived in Bettendorf, Iowa. In January 2020, M.C. was a sixth-grade student at Bettendorf Middle School ("BMS"). Plaintiff now resides in Coralville, Iowa.

4.      City of Bettendorf is a municipality organized under the laws of the State of Iowa. Bettendorf Community School District (BCSD) is a school district organized under the law of the State of Iowa. BCSD provides public education in the City of Bettendorf. BMS is a school within BCSD.

5.      James Bennett is a police officer employed by the City of Bettendorf. At all times relevant to this complaint Officer Bennett, under an arrangement between BCSD and the City of Bettendorf Police Department (BPD), was on special assignment to BCSD as a police liaison officer. He was primarily a police officer and at all times under the command of his/her designated police department supervisor. He reported to the building principal while at work in a school building. During the 2019-2020 school year, he worked at BMS. Before the 2019-2020 school year, he was assigned to the BCSD administration center and visited individual schools as needed.

6.      At all times relevant to the complaint, Officer Bennett was acting under color of state law.

**Policies and Regulations Applicable to Officer Bennett**

7.      BCSD has a job description for the position of police liaison officer, which states in part:

> The Police Liaison Officer is an officer of the Bettendorf Police Department, and an employee of the City of Bettendorf on special assignment to the Bettendorf Community School District
>
> ...

> As a juvenile officer, the Police Liaison Officer must maintain a caring attitude towards students and must remain sensitive to the problems of students and staff in the school environment.
>
> .. .
>
> The Police Liaison Officer is primarily a police officer and, as such, is at all times under the command of his/her designated police department supervisor. The officer will report to the building principal while at work in the school building.
>
> .. .
>
> The Police Liaison Officer shall not be responsible for the enforcement of school district policies but shall assist the staff in enforcement of such matters. Duties would include but not be limited to crime prevention education, drug abuse related instruction, and enforcement of criminal laws and the coordination of all classes he/she might be requested to speak at by the faculty.

8.      The Bettendorf Police Department has a directive setting department policy for the use of force, most recently reviewed in September 2019. The directive states, "It is the policy of the Bettendorf Police Department that members shall use only the force which is reasonable and necessary in a *given situation*." (Emphasis in original.) The directive relies on Iowa Code § 704.2, which explains when the use of reasonable force is justified. It states:

> A person is justified in the use of reasonable force:
>
> a) When he reasonably believes that such force is necessary to defend him or another from any imminent use of unlawful force (704.3).
>
> .. .
>
> d) When he knows that a forcible felony is being perpetrated to prevent the completion of the felony (704.7).

9.      The Bettendorf Police Department directive regarding the use of force also states, "A peace officer, while making a lawful arrest, is justified in the use of any force which the police officer reasonably believes to be necessary to effect the arrest or to defend any

3

person from bodily harm while making the arrest." The directive describes "Parameters

for the Use of Non-Lethal Force":

1. When deadly force is not authorized, officers should assess the incident to determine which non-lethal technique or weapon will best de-escalate the incident, and bring it under control in a safe efficient manner.

2. Officers are authorized to use departmental approved non-lethal force techniques and issued equipment for resolution of incidents to:

   a) Protect themselves or another from the reasonable expectation of physical harm.

   b) To restrain or subdue a resistant individual.

   c) Bring an unlawful situation safely and effectively under control.

**Background**

10.    During the 2014-2015 school year, M.C. attended Davenport Community School

District schools. Until January of 2017, M.C. attended Paul Norton Elementary School.

During the second half of the 2017-2018 school year and 2018-2019 school year, M.C.

attended Neil Armstrong Elementary School. M.C. attended BMS for six-grade at the

beginning of the 2019-2020 school year.

11.    In third grade, M.C. had behavior problems, which were the basis for BCSD

finding him eligible for special education.

12.    Plaintiff does not claim that the school district violated Section 504 of the

Rehabilitation Act of 1973 or the Individuals with Disabilities Education Act (IDEA).

This action does not seek relief for violation of rights under either statute. It seeks relief

for unlawful conduct that could occur in any public building.

13.    M.C.'s May 12, 2016, Individualized Education Program stated he engaged in

problematic avoidance behaviors including "blurting out, hitting/kicking items and

people, and verbal and physical refusals to work. At times, his behavior requires removal

4

from the classroom. Other times, Markess elopes from the classroom and/or refuses to complete work."

14. A significant trigger for M.C.'s problematic behavior is a person blocking him from walking forward. Ms. Harris repeatedly told school employees that standing in front of M.C. was a trigger.

15. On May 12, 2016, BCSD developed a plan to improve his behavior.

16. M.C.'s behavior improved when he moved from Norton Elementary School to Armstrong Elementary School.

17. During his BMS attendance, M.C. sometimes engaged in problematic behaviors. Ms. Harris was not informed of any disciplinary referrals at BMS until January 23, 2020.

18. During the years that M.C. attended Norton Elementary School, Officer Bennett learned about M.C.'s problematic behaviors.

19. On a day during third grade, the 2015-2016 school year, Officer Bennett was called to assist the classroom teacher with M.C.'s behavior. Officer Bennett kicked M.C.'s legs from under him. M.C. violently fell to the floor.

20. The earliest documented direct contact of Officer Bennett with M.C. occurred on November 8, 2017. On that day, M.C. became aggressive in the classroom. His teacher was unsuccessful in using holds to control his behavior. He was taken to the focus room (a seclusion room also called the "blue room"), where he had an opportunity to calm down and collect himself.

21. The "focus room" or "blue room" at Norton Elementary School was a "seclusion room" within the meaning of Iowa Admin. Code Agency 281, Ch. 103 (Eff. 11/12/2008).

22.    On information and belief, on November 8, 2017, Officer Bennett moved M.C. from the classroom to the focus room.

23.    Officer Bennett went into the room with M.C. and stood by the closed door. M.C. reached to open the door. Officer Bennett restrained him and moved him away from the door. He told M.C. that if M.C. did that again, he would "take him down." When M.C. accepted the dare, Officer Bennett grabbed his arm, twisted it behind his back, and pushed him to the floor into a face-down position; Officer Bennett pressed his knee into M.C.'s back. When Ms. Harris asked Officer Bennett why he would treat a small child that way, Officer Bennett said he had done the same thing to kindergarteners.

24.    During sixth-grade, the 2019-2020 school year, M.C. was sitting in the associate principal's office. Officer Bennett was the only other person in the room. M.C. stood up. Officer Bennett told him to sit down. When he did not, Officer Bennett forcefully shoved him into the chair, knocking M.C.'s head against the wall.

25.    Also during sixth-grade, Officer Bennett and M.C. were in the BMS assistant principal's office. M.C. began to stand up from his chair. As he stood, Officer Bennett grabbed the hood of his sweater and used such violence to force M.C. back in his seat he ripped M.C.'s sweater.

### Events of January 23, 2020

26.    On January 23, 2020, Officer Bennett assaulted M.C. in the principal's office at BMS. The events preceding the assault began in the hallways outside the school cafeteria.

27.    After finishing his lunch, M.C. entered the hallway outside of the cafeteria, intending to speak to a staff member standing at the gym entrance.

28.    Kristopher Tieso, a special education teacher, was standing in the hallway outside the cafeteria. He put his arm in M.C.'s path. M.C. pushed past Mr. Tieso and hurried to the gym entrance.

29.    After speaking to the staff member outside the gym, M.C. returned to the cafeteria.

30.    M.C. left the cafeteria when the bell rang to end lunch. During the passing period, he walked toward a boys' washroom near the front office.

31.    Ms. Lorelei Andedo, associate principal, and Ms. Tiana Naguina, his paraprofessional, were in the hallway. Ms. Andedo asked where he was going. He told her. He ignored her instruction to stop walking in the hallway and did not stop when she tried to block his way.

32.    When he left the washroom, Ms. Andedo and Ms. Tiana were waiting. Ms. Andedo took him to the office. After sitting in the office for several minutes, M.C. asked for and received a pass to go to his locker, get the materials he needed, and go to class. M.C. received a pass and left the office.

33.    Ms. Lisa Reid, principal of BMS, accosted M.C. in the hallway near his locker. Ms. Reid backed him against the lockers and placed an arm on each side of him with her hands touching the lockers. A conversation occurred between Ms. Reid and M.C. regarding his conduct. Ms. Reid sought M.C.'s agreement with her statements about what happened in the hallways beginning with M.C.'s leaving the cafeteria. Several times she demanded his agreement with her version of the facts. Each time he said she was wrong.

34.    Ms. Reid never accepted M.C.'s explanation of what had occurred.

35.   Ms. Reid was preventing him from getting to class to take a test. M.C. concluded he should not use his class time talking to Ms. Reid when he had a test to take.

36.   M.C. broke away from Ms. Reid to go to his classroom.

37.   Ms. Reid stopped M.C. a second time. The same disagreement continued. Officer Bennett joined the group in the hallway. At Officer Bennett's request, Markess accompanied Officer Bennett and Ms. Reid to her office.

38.   Officer Bennett did not arrest M.C. on January 23 before M.C. entered Ms. Reid's office.

39.   In Ms. Reid's office, there was talk about what had occurred from the time that M.C. left the cafeteria until Ms. Reid first accosted him in the hallway. Ms. Reid and Officer Bennett repeatedly demanded that M.C. agree that their narration of events was true. He stuck with his memory of what occurred.

40.   M.C. and Officer Bennett sat at a table in Ms. Reid's office. Ms. Reid was standing behind her desk.

41.   M.C. was agitated and wanted to walk away from Officer Bennett to cool down in a corner of the office far from Officer Bennett.

42.   M.C. had gone little distance when Officer Bennett told him to sit down. When M.C. declined, Officer Bennett put his hands on M.C.'s shoulders, forced him into a chair, and told him to stay there. M.C. stood up a second time. Officer Bennett again pushed him down into the chair and told him to stay there.

43.   When M.C. stood up each of these first two times, Ms. Reid told M.C. to stay seated. M.C. asked whether he could stand near the table. They said no.

44.    M.C. again stood up. He made no threatening action, said nothing threatening, and did nothing which would cause either Ms. Reid or Officer Bennett to fear for their safety.

45.    At about the time that M.C. stood up for the 3rd time, Ms. Reid telephoned Ms. Harris. M.C. heard Ms. Reid talking to his mother. He asked to talk to her.

46.    Ms. Harris heard M.C. tell Officer Bennett not to touch him.

47.    Neither Ms. Reid nor Officer Bennett felt in danger while Ms. Reid was talking to M.C.'s mother.

48.    Before M.C. could move away from his chair, Officer Bennett grabbed M.C. and slammed him to the floor face-down. Officer Bennett pulled M.C.'s arms behind his back, pressed his knee into M.C.'s back, handcuffed M.C., and told M.C. was under arrest. Officer Bennett said he was taking M.C. to the police station. He said he would let M.C. sit in the chair if M.C. remained calm.

49.    Ms. Harris heard M.C. tell Officer Bennett to get off of him.

50.    When Ms. Harris heard that Officer Bennett intended to take M.C. to the police station, she said she would come to school immediately and take M.C. home. Ms. Harris picked M.C. up from school to prevent Officer Bennett from taking him to the police station.

51.    Ms. Harris spoke to Officer Bennett once she was at BMS. He said she could make a complaint about his behavior, but nothing would come of it.

52.    BMS convened an IDEA IEP team meeting on about January 29, 2020, to determine whether M.C.'s behavior on January 23 had been a manifestation of his disability. M.C. and Ms. Harris were part of the team. It concluded that M.C.'s behavior had been a manifestation of his disability. During the meeting, Officer Bennett stated

that no cop will care about M.C.'s ADHD and that Officer Bennett was trying to teach M.C. how police would treat him outside of school.

## COUNT I

53.     This action is for damages under 42 U.S.C. § 1983 arising from Officer Bennett's unlawful seizure of M.C. on January 23, 2020.

54.     This action arises under the United States Constitution and a federal statute. Jurisdiction is based on 28 U.S.C. § 1331.

55.     Plaintiff incorporates the allegations of paragraphs 2 through 52 as if set forth.

56.     Officer Bennett unlawfully seized M.C. on January 23, 2020, after M.C. refused to stay seated.

57.     Bennett violated the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution when he seized M.C., threw him to the floor, and arrested him.

58.     M.C. made no threatening movement and put neither Benett nor Ms. Reid in fear of injury. He committed no crime. Officer Bennett could not reasonably believe M.C. put any person in danger when he stood for the third time.

59.     Officer Bennett knew or reasonably should have known that the written policy of the Bettendorf Police Department prohibited using force against M.C. because Officer Bennett did not reasonably believe either that non-lethal force was necessary to defend him or another from any imminent use of unlawful force or that a forcible felony was being perpetrated.

60.     Officer Bennett knew or reasonably should have known that M.C.'s standing and watching the school principal and refusing to sit down at Officer Bennett's demand did not create probable cause for arrest.

61.    When Officer Bennett seized M.C., threw him to the floor, kneeled on his back, and handcuffed him, Officer Bennett acted under color of state law and violated M.C.'s right to freedom from unreasonable seizure under the Fourth and Fourteenth Amendments to the U.S. Constitution.

## COUNT II

62.     This is an action again Officer Bennett for damages for assault and battery. Jurisdiction is based upon the Court's pendent jurisdiction. The action arises from the same operative facts as Count I.

63.    Plaintiff incorporates the allegations of paragraphs 2 through 52 and 58 through 60 as if set forth.

64.    When Officer Bennett seized M.C. and took him down to the floor, Officer Bennett intended this contact with M.C. to be insulting or offensive.

65.    When Officer Bennett seized M.C. and took him down to the floor, M.C. was insulted and offended. He suffered pain. Officer Bennett injured his wrists and forehead.

## COUNT III

66.    This is an action again Officer Bennett for damages for intentional infliction of emotional distress. Jurisdiction is based upon the Court's pendent jurisdiction. The action arises from the same operative facts as Count I.

67.    Plaintiff incorporates the allegations of paragraphs 2 through 52 and 58 through 60 as if set forth.

68.    Officer Bennett acted outrageously when the seized M.C. took him down to the floor and handcuffed him.

69.    Officer Bennett intentionally caused M.C. emotional distress or acted recklessly in disregarding the probability of causing emotional distress.

11

70.     M.C. suffered severe or extreme emotional distress. Following January 23, 2020, Markess became fearful of Officer Bennett. He feared that if he did anything a staff member or another student perceived as offensive, Officer Bennett would be called and would assault him. His fear distracted him from concentrating on academics.

71.     Officer Bennett's outrageous conduct was a proximate cause of M.C.s emotional distress.

## COUNT IV

72.     This is an action against Officer Bennett for damages for false arrest. Jurisdiction is based upon the Court's pendent jurisdiction. The action arises from the same operative facts as Count I.

73.     Plaintiff incorporates the allegations of paragraphs 2 through 52 and 58 through 60 as if set forth.

74.     M.C. committed no crime when he was in Reid's office.

75.     Officer Bennett never arrested M.C. or intended to arrest M.C. for conduct outside Reid's office.

76.     Officer Bennett did not have reasonable cause to seize M.C., take him down to the floor, and handcuff him.

77.     Officer Bennett restrained M.C. against M.C.'s will.

78.     Officer Bennett lacked a reasonable ground for believing that M.C. committed an offense when he stood up and refused to follow Officer Bennett's demand to sit.

## COUNT V

79.     This action is against the City of Bettendorf for damages for failure to train Officer Bennett properly as a school liaison officer. Jurisdiction is based upon the

Court's pendent jurisdiction. The actions which give rise to liability to plaintiff arise from the same operative facts as Count I.

80. City of Bettendorf was responsible for all BPD policies and procedures and training all employees of BPD. City of Bettendorf failed to train and educate Officer Bennett properly concerning the treatment of BCSD students, the limits on non-lethal force, and the limits of his responsibilities as a school liaison officer. Its failure to properly train Officer Bennett was the proximate cause of Officer Bennett's unlawful behavior on January 23, 2020.

81. Plaintiff incorporates the allegations of paragraphs 2 through 52 and 58 through 60 as if set forth.

82. At all times relevant to this complaint, Officer Bennett believed that he could use non-lethal force whenever M.C. did not follow his instructions.

83. On repeated occasions before January 23, 2020, Officer Bennett used non-lethal force against M.C. when M.C. did not follow his instructions.

84. Bennet repeatedly used non-lethal force against M.C. without probable cause.

85. M.C. had a right to be free from being attacked by Officer Bennett with non-lethal force when Bennet lacked probable cause to use of force against M.C.

86. On January 23, 2020, Officer Bennett did not have probable cause to throw M.C. to the floor, pin him down with a knee on his back, and handcuff him.

87. If Bennet were properly trained and supervised by City of Bettendorf, he would have known not to use non-lethal force against M.C. without probable cause and would have known non-lethal force without probable cause was an inappropriate way to teach M.C. about police conduct outside school.

## COUNT VI

88.     This is an action against the City of Bettendorf and Bettendorf Community School District for damages for failing to supervise Officer Bennett while assigned to BMS. Jurisdiction is based upon the Court's pendent jurisdiction. The actions which give rise to liability to plaintiff arise from the same operative facts as Count I.

89.     Plaintiff incorporates the allegations of paragraphs 2 through 52 and 58 through 60 as if set forth.

90.     BCSD believes, "Student learning occurs best in a safe, nurturing, caring, respectful, and positive environment supported by quality facilities and resources."

91.     BPD had a duty to train Officer Bennett about the limits on using non-lethal force imposed by law and the BPD's policies, the difference between the police role in the school environment from the broad community

92.     BCSD owed its students a duty to train Officer Bennett in the BCSD's policies regarding police officers, the appropriate way to work with and discipline students, and the limitations of using non-lethal force in schools.

93.     Officer Bennett had a history of seizing and assaulting BCSD students.

94.     Plaintiff is informed and believes that Officer Bennett assaulted other BCSD school children without probable cause during his service as a school liaison officer.

95.     During January of M.C.'s fourth-grade year, his mother decided that M.C. was not safe at Paul Norton School. Her main concern was Officer Bennett. She asked BCSD to transfer M.C. to Neil Armstrong School. When she explained the reason for requesting the transfer, she notified the principal of Paul Norton and the superintendent of BCSD about Officer Bennett's mistreatment of M.C., including two times Officer Bennett assaulted him.

96.   BCSD transferred M.C. to Neil Armstrong School, which he attended for the remainder of fourth-grade and fifth-grade, with no serious behavior incidents.

97.   BPD did not investigate and act upon Ms. Harris's complaints about Officer Bennett.

98.   BCSD and BPD did not train Officer Bennett properly regarding his authority to discipline students, to use non-lethal force against students, and the appropriate manner for dealing with behavior issues of students, like M.C., with mental disabilities affecting their behavior. BCSD and BPD were deliberately indifferent to their responsibility to train Officer Bennett properly and to protect students from his aggressive behavior.

**Exhaustion of Remedies**

99.   M.C. had an individualized education program under the Individuals with Disabilities Education Act (IDEA) during the 2019-2020 school year.

100.   M.C. left BMS on January 23, 2020, shortly after the events described. He attends BMS from January 24, 2020, through March 13, 2020. Spring break began on March 16, 2020. The 2019-2020 school year did not resume after spring break because of the COVID-19 pandemic. M.C. attended BMS for 35 days after January 23, 2020. BCSD provided no special education instruction under IDEA after March 13, 2020.

101.   During the summer of 2020, Ms. Harris took a new job in Coralville, Iowa. She and M.C. moved to Coralville during the summer. M.C. has not been enrolled in BCSD since the 2019-2020 school year.

102.   An IDEA hearing officer in an IDEA due process proceeding against BCSD cannot provide prospective relief for M.C.

103.    What, if any, effect the events of January 23, 2020, interfered with his academic progress cannot be determined.

104.    BCSD does not believe the events of January 23, 2020, affected M.C.'s academic progress.

## Damages

105.    Because of the defendants' unconstitutional conduct, M.C. suffered physical injury, distress, humiliation, and embarrassment. Plaintiff incurred medical expenses for her mental health. For all of the above, plaintiff should receive compensation from the defendants in a reasonable sum, which the plaintiff suggests is $25,000.00.

## Punitive Damages

106.    Because of the defendants' actions plaintiff requests he be awarded punitive damages according to law. Plaintiff suggests that $100,000.00 is reasonable under the circumstances.

## Jury Demand

Plaintiff requests a jury trial.

WHEREFORE, plaintiff requests that the Court enter judgment against defendants for compensatory damages of $25,000.00, for punitive damages of $100,000.00, for her costs, for attorney fees, and for all other relief to which plaintiff may be entitled.

Dated:March 9, 2021                    /s/ David C. Roston
                                        Attorney for plaintiff M.C. *ex rel.*
                                        S. Harris

David C. Roston
Law Office of David C. Roston
2000 Forest Hill Circle
Coralville, IA 52241
Tel:    319-321-5646
Fax:    319-466-9417
david@rostonlaw.com